IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONWIDE FREIGHT SYSTEMS, INC., | ) | |
| LEADER U.S. MESSENGER, INC., and | ) | |
| STOTT CONTRACTING, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 12 C 2486 |
| | ) | |
| THOMAS BAUDINO, CRAIG BANER, and | ) | |
| LATRICE KIRKLAND-MONTAGUE, | ) | |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

JAMES F. HOLDERMAN, District Judge:

Plaintiffs Nationwide Freight Systems, Inc. ("Nationwide"), Leader U.S. Messenger, Inc. ("Leader"), and Stott Contracting, LLC ("Stott") (collectively "Plaintiffs") are motor carriers that have been separately investigated and charged by the Illinois Commerce Commission ("ICC"). (Dkt. No. 41 ("Pls.' SMF") ¶ 2.) Plaintiffs are seeking declaratory and injunctive relief, and allege that document requests made by ICC agents Thomas Baudino ("Baudino") and Craig Baner[1] ("Baner"), later upheld by ICC Chief Administrative Law Judge Latrice Kirkland-Montague[2] ("Kirkland-Montague") (collectively "Defendants"), are preempted by 49 U.S.C. § 14501(c). The court's jurisdiction over Plaintiffs' claims is provided by 28 U.S.C. § 1331.

---

[1] As previously recognized by the court, Craig Baner has been substituted for Odie Carpenter in his official capacity as a defendant in this lawsuit. (Dkt. No. 30 ("11/26/12 Order") at 1, n.1.)

[2] Defendants have not pleaded or argued that Kirkland-Montague is protected by the doctrine of judicial immunity, thereby waiving this defense. *See Boyd v. Carroll*, 624 F.2d 730, 733-34 (5th Cir. 1980) ("The failure to plead judicial immunity waived the affirmative defense."); *cf. Henry v. Jefferson County Personnel Bd.*, 519 F. Supp. 2d 1171, 1181, n.10 (N.D. Ala. 2007) ("Defendant's explicit assertion of the judicial immunity defense in a Rule 56 pre-trial motion is sufficient to avoid wavier.").

(*See* 11/26/12 Order at 6.)  Now before the court are Plaintiffs' Motion for Summary Judgment (Dkt. No. 43) and Defendants' Motion for Summary Judgment (Dkt. No 40).  For the reasons set forth below, Defendants' motion for summary judgment is granted and Plaintiffs' motion for summary judgment is denied.

## BACKGROUND

Plaintiffs are motor carriers, as defined by federal law.  (Pls.' SMF ¶ 2l; *see also* 49 U.S.C. § 13102(14).)  It is undisputed that each plaintiff was "the subject of an investigation, hearing, and determination by the [ICC]," and that "[t]he pleadings and orders were essentially the same in each case."  (*Id.* ¶¶ 2, 8.)  This common sequence of events is detailed below.

Initially, ICC Police Officers[3] issued each plaintiff a citation for "operat[ing] as an intrastate motor carrier of property without a license from the Commission," in violation of 625 ILCS 5/18c-4104(1)(a).  (Dkt. No. 45 ("Defs.' SMF") ¶¶ 4, 8, 12.)  The ICC then began investigating each plaintiff's operations.  (Pls.' SMF ¶ 9.)  ICC Police Officers first requested that Plaintiffs produce certain records under 625 ILCS 5/18c-1703(2)(b),[4] followed by a formal demand for records from the ICC Chief of Police seeking production of various documents "concerning the operations of those motor carriers."  (Pls.' SMF ¶ 10.)  Specifically, the formal

---

[3]  The citations issued to Stott and Nationwide appear to have been issued by Officer Baudino. (*See* Defs.' Ex. A at ICC:00043 ("Stott Initial Citation"); Defs.' Ex. B at ICC:00199 ("Nationwide Initial Citation").)  The citation issued to Leader appears to have been issued by a different officer.  (*See* Defs.' Ex. C at ICC:00360 ("Leader Initial Citation").)

[4]  Section 1703(2)(b) states, in relevant part:

> Authorized employees of the [ICC] shall have the power at any and all times to examine, audit, *or demand production of* all accounts, books, records, memoranda, and other papers in the possession or control of a license or registration holder, its employees or agents.

625 ILCS 5/18c-1703(2)(b) (emphasis added).

demand provided to Leader required Leader to "produce documents and records regarding your company's transportation operations within Illinois (for example, bills of lading, driver logs, invoices, pick-up tickets, etc.)" for the six-month time period preceding the initial citation. (Defs.' Ex. C at ICC:00362 ("Leader Formal Demand").) The formal demand provided to Stott and Nationwide only generally directed these motor carriers to "produce [their] books and records" for the relevant six-month time period. (Defs.' Ex. A at ICC:00026 ("Stott Formal Demand"); Defs.' Ex. B at ICC:00182 ("Nationwide Formal Demand").)

Plaintiffs objected to the ICC's requests for documents, partly on the grounds that the requests were preempted by 49 U.S.C. 14501(c). (Pls.' SMF ¶ 11; Defs.' SMF ¶¶ 7, 11, 15.) In response to Plaintiffs' objections, the ICC submitted letters to Stott and Nationwide "renew[ing]" and clarifying its previous requests for documents:

> The Commission formally requests [Stott or Nationwide] to produce the following documents related to its intrastate, for-hire transportation operations within Illinois for the [specified] time period . . . :
> a. Bills of lading;
> b. Driver logs;
> c. Invoices from any owner-operators leased on to [Stott or Nationwide]; and
> d. Any other documents containing the origin and destination of cargo, the date(s) of the transportation, a description of the cargo transported, and the revenues generated by the transportation.

(Defs.' Ex. A at ICC:00030 ("Stott Clarification"); Defs.' Ex. B at ICC:00186 ("Nationwide Clarification").) When Plaintiffs persisted in objecting to the ICC's document requests, Plaintiffs were cited with violating 625 ILCS 5/18c-4104(1)(k),[5] because of their alleged "fail[ure] to provide Records on demand." (Defs.' Ex. A at ICC:00015 ("Stott 2d Citation"); Defs.' Ex. B at ICC:00175 ("Nationwide 2d Citation"); Defs.' Ex. C at ICC:00333 ("Leader 2d

---

[5] Section 4104(1)(k) states, in relevant part, that it "shall be unlawful for any person to . . . [o]therwise operate as a motor carrier of property in violation of any provision of this Chapter, Commission regulations and orders, or any other law of this State." 625 ILCS 5/18c-4104(1)(k).

Citation").)  In each case, the ALJ found the motor carrier guilty of the violations charged in the second citations, and ordered each plaintiff to pay a $500 civil penalty for failure to produce the requested records.  (Defs.' Ex. A at ICC:00129 ("Stott ALJ Decision"); Defs.' Ex. B at ICC:00275 ("Nationwide ALJ Decision"); Defs.' Ex. C at ICC:00381 ("Leader ALJ Decision").) Plaintiffs' combined petition for rehearing was summarily denied by the ICC on March 21, 2012. (Pls.' SMF at ¶¶ 14-15; *see also* Defs.' Ex. A at ICC:00149 ("Tr. 3/21/12 ICC Bench Session") .)

Plaintiffs filed this lawsuit two weeks later, on April 4, 2012, claiming that federal preemption barred the ICC from investigations of Plaintiffs that concerned "anything other than compliance with insurance requirements or demonstrated safety issues."  (Compl. at 8 ("Request for Relief") at (b), (e).)  Plaintiffs and Defendants have now both submitted cross motions for summary judgment, which have been fully briefed before this court.

## LEGAL STANDARD

1.  Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the initial responsibility of identifying materials in the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also* Fed. R. Civ. P. 56(c)(1).  If the moving party adequately challenges the elements of the nonmoving party's claim, it then becomes the nonmoving party's burden "to identify specific facts in the record that demonstrate[ ] a genuine issue for trial."  *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 647 (7th Cir. 2011). "A factual dispute is 'material' only if the dispute's resolution might change the outcome of the suit under the governing law."  *Spivey v. Adaptive Mktg. LLC,* 622 F.3d 816, 822 (7th Cir. 2010).

4

"And a factual issue is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When ruling on a motion for summary judgment, the court "construe[s] all facts and draw[s] all reasonable inferences in a light most favorable to the nonmoving party." *Rosenbaum v. White*, 692 F.3d 593, 599 (7th Cir. 2012). This same standard applies when parties have filed cross motions for summary judgment, and the court "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Id.* (citations omitted); *accord Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 915 (7th Cir. 2012) (the court "treat[s] the motions separately in determining whether judgment should be entered in accordance with Rule 56").

2.    <u>FAAAA Preemption</u>

Plaintiffs argue that Defendants' enforcement of 625 ILCS 5/18c-1703(2)(b) and 625 ILCS 5/18c-4104(1)(k) is preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"). (Dkt. No. 42 ("Pls.' Mem.") ¶¶ 12, 22.) This argument is implicitly grounded in the Supremacy Clause of the U.S. Constitution, which states, in relevant part, "[the] Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI. The Supreme Court has interpreted the Supremacy Clause to allow for federal preemption of state law either expressly or implicitly, or in cases where there is a conflict between state and federal law. *See New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995) (citations omitted). As explained in detail below, the FAAAA contains an express preemption clause, and it is this preemption clause that forms the basis of Plaintiffs' claims.

<u>ANALYSIS</u>

1.    <u>No Genuine Dispute of Material Fact</u>

The material facts of this case are not contested.  Defendants admit "that the [ICC] sought documentary information, as part of its enforcement activities under Illinois law, concerning [Plaintiffs'] operations in Illinois, after [Plaintiffs] were cited for violating Illinois law."  (Dkt. No. 31 ("Defs.' Ans.") ¶ 18.)  Defendants further admit that "[t]he information sought included bills of lading, driver logs, invoices, pick-up tickets, and similar information concerning the origin and destination of cargo, dates of transportation, description of the cargo transported, and revenues generated by the transportation."  (*Id.*)  Plaintiffs admit that the ICC sought the business records in question "to determine how long [each] company was operating without the required certificate, and to determine if the company had evidence of the required liability insurance coverage on file with the Commissioner during the period it was operating in the State of Illinois."  (Defs.' SMF ¶ 17; *see also* Dkt. No. 48 ("Pls.' Resp. to Defs.' SMF") ¶ 1.)[6]

The parties dispute the legal significance of these undisputed facts, and whether Defendants' actions were permissible under federal law.  (*See* Defs.' SMF ¶ 18; Pls.' Resp. to Defs.' SMF ¶ 1.)

---

[6]  Plaintiffs allege in their Complaint that the ICC Police Officer testifying at the Stott hearing "indicated that the Illinois Commerce Commission was NOT looking for any information on the carrier's Insurance."  (Compl. ¶ 16 (emphasis in original).)  Plaintiffs admit in their summary judgment briefing that the only evidence they have in support of this assertion is "a note made by [Plaintiffs' counsel] at the hearing."  (Dkt. No. 53 ("Pls.' SMF Reply") ¶ 1).)  Counsel's notes of the Stott hearing, which have been submitted as part of the record, include the statement "nothing relative to insurance" among other handwritten words and phrases.  (*Id.*, Ex. 1 (bottom of page).)  Plaintiffs have supplied no affidavit or declaration from counsel explaining this notation, or the context in which it was made.  The court does not know the identity of the testifying officer, the pending question to which the officer was responding, or whether counsel's notation reflects the officer's exact words or counsel's impression of the testimony.  Without more, even viewing this evidence in the light most favorable to Plaintiffs, the court finds that counsel's notation is inadequate to establish a genuine question of fact on this evidentiary point.

2.     <u>FAAAA's Express Preemption Clause</u>

The FAAAA contains an express preemption clause which states, in relevant part:

> (1) General rule.--Except as provided in paragraphs (2) and (3), a State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property.

49 U.S.C. § 14501(c)(1).[7]

Plaintiffs argue that Defendants sought records "related to" Plaintiffs' "price[s], route[s], or service[s]," and Defendants' enforcement of 625 ILCS 5/18c-1703(2)(b) and 625 ILCS 5/18c-4104(1)(k) was therefore preempted based on the plain language of the FAAAA. Defendants contend that their enforcement actions were not "related to" Plaintiffs' "price[s], route[s], or service[s]" as that phrase has been interpreted by the U.S. Supreme Court and other federal courts, and that Defendants' enforcement actions are therefore not preempted by the FAAAA's express preemption clause.

The language of the FAAAA's express preemption clause is borrowed from the Airline Deregulation Act of 1978 ("ADA"), which contains a nearly identical provision for air carriers. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008) (citing 49 U.S.C. § 41713(b)(4)(A)). Courts have generally treated the preemption clauses of the FAAAA and the ADA as though they are interchangeable,[8] and have attributed to Congress an intent to

---

[7] Paragraph 2, the only relevant exception to the express preemption clause, is discussed in Section 3, *infra*.

[8] As originally enacted, the ADA referred to "rates, routes, or services." 49 U.S.C. App. § 1305(a)(1). In 1994, the ADA was reenacted and revised to refer to "a price, route, or service." *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 223 n.1 (1995) (citing 49 U.S.C. § 41713(b)(1)); *see also* 49 U.S.C. § 41713(b)(4)(A) (applying same language to all carriers "affiliated with a direct air carrier"). This court finds no material difference between "price" and

incorporate judicial interpretations of the ADA's preemption provision into the FAAAA.  *Id.* (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006)); *see also S.C. Johnson & Son, Inc. v. Transport Corp. of Am.*, 697 F.3d 544, 548 (7th Cir. 2012) ("the Supreme Court has generally taken the position that the statutes deregulating the airline industry and those deregulating the trucking industry should be construed consistently with one another"). The purpose of both provisions is "[t]o ensure that States would not undo federal deregulation with regulation of their own."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378 (1992).

In *Morales*, the Supreme Court addressed whether a state attorney general's threat to enforce a set of "detailed standards governing the content and format of airline advertising" through state law consumer protection statutes was preempted under the ADA.  *Morales*, 504 U.S. at 379.  Borrowing from ERISA cases to interpret the ADA's express preemption clause, the Court held that "State enforcement actions *having a connection with or reference to* airline 'rates, routes, or services' are pre-empted."  *Id.* at 384 (emphasis added).  The Court noted that the state law at issue need not be "specifically addressed to the airline industry" and can be preempted even if the effect of the state law is "only indirect."  *Id.* at 386.  At the same time, however, the Court cautioned that some state laws or enforcement actions could affect rates, routes, or services "in too tenuous, remote, or peripheral a manner" to qualify for preemption. *Id.* at 390 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983)) (internal quotations omitted).  On the specific facts in *Morales*, the Court concluded that the threatened enforcement action was preempted under the ADA because, "[a]ll in all, the obligations imposed by the guidelines would have a significant impact upon the airlines' ability to market their product, and hence a significant impact upon the fares they charge."  *Id.*

---

"rate" for purposes of its preemption analysis.  *Wolens*, 513 U.S. at 223 n.1 (noting "Congress intended the revision to make no substantive change").

Three years later, in *American Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995), the Supreme Court addressed the ADA preemption provision as a defense to a class of plaintiff claims brought under the Illinois Consumer Fraud and Deceptive Business Practices Act and Illinois common law for breach of contract, alleging that the defendant airline engaged in cutbacks on the utility or value of pre-earned frequent flyer miles. The Court in *Wolens* began by noting that "[t]he *Morales* opinion presented much more" than an interpretation of the phrase "relating to," and that the Court in *Morales* also focused on the ADA's "deregulatory purpose" and the strength of the state laws' impact on airline rates, routes, or services. *Id.* at 223-24. On the facts presented in *Wolens*, the Court easily concluded that the plaintiffs' claims related to airline rates and services. *Id.* at 226 ("We need not dwell on the question whether plaintiffs' complaints state claims 'relating to [air carrier] rates, routes, or services.'"). Because the Illinois Consumer Fraud Act inherently permitted, though private litigation, "intrusive regulation of airline business practices" such as the marketing of rates and services, the Court deemed plaintiffs' attempts to enforce the Illinois Consumer Fraud Act against the airline to be preempted under the ADA. *Id.* at 227-28. With respect to the common law breach of contract claims, on the other hand, the Court found no similar "state-imposed obligations" and thus no preemption. *Id.* at 228-29. As the Court noted in both *Morales* and *Wolens*, the ADA was designed to promote "maximum reliance on competitive market forces." *Id.* at 230 (quoting 49 U.S.C. App. § 1302(a)(4)); *Morales*, 504 U.S. at 378 (same). State law claims based solely on an airline's "own, self-imposed undertakings" and its "privately ordered obligations," such as breach of contract claims, are not preempted because they promote "[m]arket efficiency" rather than hindering it. *Wolens*, 513 U.S. at 228-30.

In *Rowe v. New Hampshire Motor Transport Association*, the Court addressed whether the State of Maine was preempted under the FAAAA from enforcing a state statute regulating the delivery of tobacco products to minors. *Rowe v. N.H. Motor Trans. Ass'n*, 552 U.S. 364 (2008). Because the state law at issue would "require carriers to offer a system of services that the market does not now provide," the Court held that the statute had both "a direct 'connection with' motor carrier services" and "a 'significant' and adverse 'impact' in respect to the FAAAA's ability to achieve its preemption-related objectives." *Id.* at 371-72 (citing *Morales*, 504 U.S. at 384, 390). The Court identified the main preemption objective of the FAAAA as "avoid[ing] . . . a State's direct substitution of its own governmental commands for 'competitive market forces.'" *Id.* at 372 (quoting *Morales*, 504 U.S. at 378). In response to the state's argument that it nevertheless retained the ability to "protect its citizens' public health," the Court noted in dicta that "state regulation that broadly prohibits certain forms of conduct and affects, say, truckdrivers, only in their capacity as members of the public (*e.g.*, a prohibition on smoking in certain public places)" would not qualify for preemption, because such laws affect "rates, routes, or services in 'too tenuous, remote, or peripheral a manner.'" *Id.* at 375 (quoting *Morales*, 504 U.S. at 390). The Court emphasized "the state laws whose 'effect' is 'forbidden' under federal law are those with a '*significant* impact' on carrier rates, routes, or services." *Id.* at 375 (emphasis in original) (quoting *Morales*, 504 U.S. at 388, 390). The Court concluded that "Maine's efforts directly to regulate carrier services" were preempted under this standard. *Id.* at 377.

The Seventh Circuit has interpreted the relevant Supreme Court precedent as setting forth "two distinct requirements" for preemption under the ADA/FAAAA framework. *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir. 1996). First, a

state must "enact or enforce" a law. *Id.* This requirement is satisfied by all sources of state law, including plaintiffs' efforts to enforce state laws of general applicability and common law torts. *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 607-08 (7th Cir. 2000). Second, as applied in the context of specific cases, the state law at issue must relate to carrier rates, routes, or services "either by expressly referring to them or by having a significant economic effect upon them." *Travel All Over the World*, 73 F.3d at 1432. Laws that have "a generalized effect on transactions in the economy as a whole" and that "provide the backdrop for private ordering," such as embezzlement, bribery, and racketeering statutes, are considered "too tenuously related to the regulation of the rates, routes, and services in the trucking industry to fall within the FAAAA's preemption rule." *S.C. Johnson & Son, Inc. v. Transport Corp. of Am., Inc.*, 697 F.3d 544, 558-59 (7th Cir. 2012). Thus, "an effect on price may be necessary for preemption, but it is not sufficient." *Id.* at 558-59. On the other hand, laws of general application that have an "industry-wide effect on prices and services," such as consumer fraud laws, are generally preempted under the FAAAA to the extent they affect rates, routes, or services. *Id.* at 559; *see also Mesa Airlines*, 219 F.3d at 611 (claims of tortious interference with contract, breach of fiduciary duty, and fraudulent inducement preempted under the ADA because, as alleged by regional airlines against a major air carrier, these claims "would have a significant effect on" the major air carrier's rates, routes, or services). As a general rule, any law or claim that "seeks to substitute a state policy . . . for the agreements that the parties had reached" is preempted. *S.C. Johnson*, 697 F.3d at 557.

In this case, there is no question that Illinois has enacted and enforced 625 ILCS 5/18c-1703(2)(b) and 625 ILCS 5/18c-4104(1)(k), and that these laws are specific to motor carriers. On their face, the Illinois statutes do not expressly refer to the rates, routes, or services of motor

carriers. In enforcing Section 1703(2)(b), however, Defendants sought "bills of lading, driver logs, invoices, pick-up tickets, and similar information concerning the origin and destination of cargo, dates of transportation, description of the cargo transported, and revenues generated by the transportation." (Defs.' Ans. ¶ 18.) At a broad level, viewing this evidence in the light most favorable to Plaintiffs, as the court must do at this stage of the litigation, the court finds that Defendants' requests for documents could be reasonably construed as requests for Plaintiffs to produce information about their rates, routes, or services. (*See* Dkt. No. 50 ("Defs.' Resp.") at 2 ("There is no dispute the Commission sought documents *about* cargo and prices, driver logs, etc.") (emphasis in original).) Defendants' enforcement of Illinois law can therefore be considered "related to" Plaintiffs' rates, routes, or services in the sense that the enforcement actions have "a connection with" Plaintiffs' rates, routes, or services. *Morales*, 504 U.S. at 384.

Even under *Morales*, however, "the breadth of the words 'related to' does not mean the sky is the limit." *Dan's City Used Cars, Inc. v. Pelkey*, 133 S. Ct. 1769, 1778 (2013). This court must also consider the deregulatory purpose of the FAAAA, and wither the statutes at issue have "a *significant* impact on carrier rates, routes, or services." *Rowe*, 553 U.S. at 375 (emphasis in original) (internal quotation marks omitted); *see also Travel All Over the World*, 73 F.3d at 1430 ("The Congressional intent to preempt state law should be the ultimate touchstone in our preemption analysis."). In this case, there is no evidence that Defendants' actions affected Plaintiffs' rates, routes, or services in any way, or that the Illinois statutes and their enforcement by Defendants are an attempt to substitute Illinois's "own governmental commands for 'competitive market forces.'" *Rowe*, 553 U.S. at 372 (quoting *Morales*, 504 U.S. at 378). Pursuant to the state statute at issue, Defendants sought "production of all accounts, books, records, memoranda, and other papers *in the possession or control of*" Plaintiffs. 625 ILCS

12

5/18c-1703(2)(b) (emphasis added). Plaintiffs were not required to maintain any particular records or forms, other than those already maintained in the ordinary course of their businesses, nor were Plaintiffs required to charge certain rates, take specific routes, or offer any special services. Plaintiffs do not actually claim any effect on rates, routes, or services in this case, instead taking the position "it is impossible at this time to articulate the particular effect which those investigations may have on the actual rates, followed routes, or offered services which the motor carriers may offer." (Dkt. No. 42 ("Pls.' Mem.") ¶ 21.) Plaintiffs' speculation that the ICC might prescribe special forms or punish motor carriers for not providing specific information, (*id.*), is entirely speculative and is not supported by the record. Additionally, Plaintiffs' argument that "[i]f a state law or enforcement activity relates *in any way* to motor carrier rates, routes or service, that state law and that enforcement activity are preempted," (*id.* ¶ 19 (emphasis added)), is not supported by the Supreme Court and Seventh Circuit case law set forth above. *See S.C. Johnson*, 697 F.3d at 558-59 (describing an "effect on price [or routes, or services]" as a condition "necessary for preemption").

As the Seventh Circuit has noted, "the broad applicability of the preemption statutes should be understood in light of their deregulatory purpose." *S.C. Johnson*, 697 F.3d at 559. Because the Illinois statutes at issue on their face do not attempt to regulate motor carrier rates, routes, or services, and, as enforced, do not impact Plaintiffs' rates, routes, or services in any way, the court finds no preemption under the FAAAA's express preemption clause.

3. <u>Safety Regulatory Authority and Insurance Exception</u>

In the alternative, even if Defendants' enforcement of 625 ILCS 5/18c-1703(2)(b) and 625 ILCS 5/18c-4104(1)(k) is properly considered to be preempted under Paragraph 1 of the

FAAAA's express preemption clause, the court finds that Defendants qualify for the exception set forth in Paragraph 2. The relevant exception states:

> [The FAAA's general rule regarding preemption] shall not restrict the safety regulatory authority of a State with respect to motor vehicles . . . or the authority of a State to regulate motor carriers with regard to minimum amounts of financial responsibility relating to insurance requirements and self-insurance authorization.

49 U.S.C. § 14501(c)(2)(A). This exception preserves "the preexisting and traditional state police power over safety," and state laws that are "genuinely responsive to safety [or insurance] concerns" are included within the exception. *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 339, 442 (2002).

It is undisputed that Illinois law requires motor carriers to have proof of liability insurance coverage on file with the ICC. *See* 625 ILCS 5/18c-4901; 625 ILCS 5/18c-4904. It is also undisputed that motor carriers may not operate in Illinois without first obtaining a license from the ICC. *See* 625 ILCS 5/18c-4104(1)(a). Defendant Baner states in his sworn declaration that the purpose of seeking the requested documents from motor carriers is two-fold: "to determine how long the commercial motor carrier has been operating in Illinois without a certificate . . . [and] to determine if it had the required insurance coverage and that this insurance coverage was on file with the Illinois Commerce Commission for this period." (Dkt. No. 44-9, Defs.' Ex. F ("Baner Decl.") ¶ 4.) There is no evidence in the record suggesting that Baner's explanation is untrue, or that Defendants were not genuinely attempting to ascertain Plaintiffs' compliance with Illinois' licensing and insurance requirements by issuing their requests for documents. Plaintiffs' argument that "[n]othing in those documents concern insurance or safety matters," (Pls.' Mem. ¶ 13), is unpersuasive in light of the undisputed fact that Defendants requested "information concerning the origin and destination of cargo, dates of transportation, description of the cargo transported, and revenues generated by the transportation." (Defs.' Ans.

14

¶ 18.)  As a matter of common sense, this type of information is relevant to ascertaining whether a motor carrier is properly licensed and insured.

Because the enforcement actions at issue in this case fall squarely within the exception set forth in Paragraph 2, the court grants summary judgment in favor of Defendants on this alternative basis, as well.

<u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs' motion for summary judgment (Dkt. No. 40) is denied and Defendants' motion for summary judgment (Dkt. No. 43) is granted.  Judgment is entered in favor of Defendants pursuant to Federal Rule of Civil Procedure 56.  Civil case terminated.

ENTER:


_James F. Holderman_
JAMES F. HOLDERMAN
District Judge, United States District Court

Date:  September 23, 2013

15